# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KIMBERLY A. THOMPSON**
        **Plaintiff,**

    v.                                          Case No. 18-C-266

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Kimberly Thompson seeks judicial review of the denial of her application for social security disability benefits. For the reasons that follow, I affirm the Commissioner's decision and dismiss this action.

## I. FACTS AND BACKGROUND

**A.    Plaintiff's Application and Administrative Decisions**

Plaintiff applied for benefits on January 29, 2013, alleging that she became disabled as of August 30, 2012, due to depression, bipolar disorder, neck and back problems.[1] (Tr. at 15, 420.) The agency denied the application initially on November 6, 2013, with the agency's reviewing consultants, Drs. Walls and Mamaril, finding insufficient evidence to substantiate the presence of a disorder or impairment.[2] (Tr. at 140-51.)

---

[1] The record indicates that plaintiff filed previous applications. At the hearing on the instant application, she indicated that she received benefits for a closed period of about one year following a motor vehicle accident during which she injured her neck in 1997. (Tr. at 93; see also Tr. at 84-86.) She also filed an application in 2009, which was denied at the administrative level up to the Appeals Council on August 29, 2012. (Tr. at 138.)

[2] It appears that plaintiff missed consultative examinations scheduled prior to the initial determination. (Tr. at 140-41.)

On November 7, 2013, plaintiff underwent a consultative orthopedic exam with Dr. Linford. Plaintiff presented with a chief complaint of neck and right shoulder pain, reporting that she underwent posterior C3-4 spinal fusion surgery following a motor vehicle accident in 1997. She reported pain mostly on the upper right side of her neck with some radiation into her shoulder on the right. She further indicated that she usually ambulated with a cane, although she did not have one with her that day. (Tr. at 768.) On exam, cervical range of motion was somewhat decreased with forward flexion. She was mildly tender about her right shoulder, but she had no tenderness to palpation about her lumbar spine. Neurologic exam revealed normal strength, and she had negative straight leg raises bilaterally. Exam of the bilateral upper extremities revealed normal alignment and painless functional range of motion of the shoulders, elbows, wrists, and digits. She had full rotator cuff strength of the right shoulder. She was also able to reach over head and had preserved grip strength and manual dexterity. Lower extremity exam showed normal alignment and painless functional range of motion of the hips, knees, ankles, and feet. She walked with a normal heel-to-toe pattern without any assistive devices and was able to rise on her toes and heels, arise from a chair comfortably, and get on and off the exam table without difficulty. (Tr. at 769.) Dr. Linford concluded that while plaintiff had relatively preserved cervical range of motion, due to her neck pain, "she would not tolerate any overhead activity or lifting heaving loads, pushing or pulling heavy loads repetitively." (Tr. at 770.)

On June 24, 2014, plaintiff underwent a consultative medical exam with Dr. Hafeez for evaluation of her back problem, stomach pain, and eye issues. Plaintiff reported lower back pain since the 1997 auto accident. She had another accident in 2012, when she slipped at home and hurt her back again. She reported using a walker and cane, and needing help from

others with housework.  However, she did not bring her cane to the exam.  She also reported joint pain and hand stiffness, indicating that she was scheduled to see a rheumatologist.  She further reported right knee pain since 1997.  Finally, she reported that her distance vision was fine, but she believed she needed reading glasses.  (Tr. at 789.)  On exam, she appeared in no acute distress.  Snellen chart examination without glasses revealed 20/20 vision on each side.  She had good hand grips, with no inflammatory signs over the hands or wrists.  She had no limitation in the movement of either shoulder and full range of movement at the neck.  (Tr. at 790.)  Her lumbosacral spine was tender, but straight leg raise was negative bilaterally, she was able to flex to 90 degrees, and gait was normal.  (Tr. at 791.)  For his impression, Dr. Hafeez noted lower back pain as a result of the 1997 accident, aggravated again in 2012.  Plaintiff reported needing a cane and at times having difficulty walking, but during the exam she had a normal gait, did not appear to have any difficulty walking and bending, and straight leg raise was negative.  As for her joint pain, she brought a paper indicating her rheumatoid factor was elevated, but clinically she did not show any signs of rheumatoid arthritis.  As for her stomach pain, plaintiff denied this was happening anymore.  As for her eye problem, she had difficulty reading close but at distance she did fine on the Snellen chart examination.  (Tr. at 791.)  Dr. Hafeez ordered an x-ray of the lumbosacral spine, which revealed mild degenerative disc disease at several levels, most pronounced at L3-4.  (Tr. at 792.)

On July 8, 2014, plaintiff underwent a psychological consultative evaluation with Dr. Dolezal, indicating that she had been unable to work since her surgery in 1997.  (Tr. at 795.)  Dr. Dolezal diagnosed mood disorder, generalized anxiety disorder, alcohol abuse, and history

3

of opioid abuse, with a GAF of 60.[3]  In a statement of work capacity, Dr. Dolezal wrote:

> [Plaintiff] appears to have the ability to understand, remember, and carry out simple instructions if she chooses to.  However, multi-step or multitasks may be difficult for her to remember.  With regard to her ability to interact appropriately with supervisors and coworkers, she is likely to experience moderate difficulty at times based on her mood shift.  She appears to be able to maintain attention and concentration adequately to do limited or low skill employment.  Her work pace may be slowed due to physical limitations; however, this would need to be assessed by a physician.  She presented to the evaluation with psychomotor slowing.  She may have mild impairment of her ability to withstand routine work stresses and to adapt to changes due to symptoms of anxiety and depression. [Plaintiff] would benefit from continuing to receive individual psychotherapy and psychopharmacological treatment.

(Tr. at 800.)

On July 24, 2014, the agency denied plaintiff's request for reconsideration of the initial denial (Tr. at 298), relying on the review of Dr. Biscardi, who found that plaintiff could mentally handle simple, routine work involving limited interactions with others (Tr. at 162-63) and Dr. Bente, who opined that plaintiff could physically perform a range of light work (Tr. at 164-66). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 300.)

**B.    Hearing**

On July 20, 2016, plaintiff appeared with counsel before an ALJ.  The ALJ also summoned a vocational expert ("VE") to the hearing.  (Tr. at 87.)

    **1.    Plaintiff**

Plaintiff testified that she was then 47 years old and lived with her 17 year old daughter; she had two other, adult children.  (Tr. at 92.)  She had completed high school and obtained

---

[3]GAF stands for "Global Assessment of Functioning."  Set up on a 0-100 scale, scores of 51-60 denote "moderate" symptoms, 61-70 "mild" symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

4

an associate's degree or certificate in criminal justice. (Tr. at 94-95.) She reported previous employment as a part-time bus driver and cleaner, but the ALJ concluded that her earnings were insufficient for these jobs to constitute past relevant work. (Tr. at 95-96.)

Regarding her physical impairments, plaintiff testified that she continued to experience pain in her neck and right arm related to the 1997 accident. (Tr. at 96-97.) She also testified to pain and swelling in her right knee. (Tr. at 99.) She further reported problems with her vision, but she had not undergone any testing for that. (Tr. at 100.) Finally, she complained of back pain, for which she received medication and physical therapy. (Tr. at 101.) Plaintiff testified that she tried not lift with her right arm; with the left, she could lift about 10 pounds. (Tr. at 102.) She further reported trouble walking more than short distances, standing for more than 20 minutes, and sitting for more than five minutes on a bad day. (Tr. at 102-03.)

Regarding her mental impairments, plaintiff reported periods where she was up and motivated followed by periods where she was down, could not focus, and stayed to herself. (Tr. at 103-04.) She took medications for her mental health conditions, which caused fatigue. (Tr. at 104-05.)

Plaintiff testified that on a typical day she took her medication, ate whatever food was prepared for her to eat, and walked around the house making sure no one was trying to get in. (Tr. at 106.) She denied drinking alcohol in the last two years. (Tr. at 107.) The ALJ pointed out positive tests for alcohol in 2015, and plaintiff responded that she could not remember why those tests were positive. (Tr. at 108.) Plaintiff indicated that her children did the shopping and laundry; at times, they helped her with daily needs like showering and dressing. (Tr. at 116.)

**2.    Plaintiff's Son**

Plaintiff's 26-year old son testified that plaintiff had problems with her neck, right

5

shoulder and arm, and knee. He indicated that he did the main duties in the house, taking out the garbage, straightening up, etc. (Tr. at 118.) Sometimes his mother needed help with personal care. (Tr. at 118-19.) He further testified that his mother had trouble getting along with others. (Tr. at 121.)

### 3. VE

The ALJ asked the VE about a hypothetical person able to perform light work, limited to occasional pushing and pulling with the right (dominant) arm; occasionally reaching overhead and frequently reaching in all other directions with the right arm; occasionally climbing, stooping, kneeling, and crouching; able to understand, remember, and carry out simple, routine, repetitive tasks but not at a production rate pace; occasionally interacting with supervisors and coworkers, never interacting with the public; and engaging in no more than occasional decision making and exposed to no more than occasional changes in the job setting. (Tr. at 128-29.) The VE testified that such a person could work as an office helper, food preparer, and sorter. (Tr. at 129-30.) If the person were off task 10% of the workday, that would not change the answer, but being off task 20% of the time would be work preclusive. (Tr. at 130-31.) Two absences per month on a regular basis would also prevent a person from maintaining these jobs. (Tr. at 131.)

**C.     ALJ's Decision**

On August 9, 2016, the ALJ issued an unfavorable decision. (Tr. at 12.) Following the familiar five-step process, see 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date (step one); that she suffered from the severe impairments of status post posterior cervical fusion,

degenerative disc disease of the lumbar spine, mood disorder, generalized anxiety disorder, alcohol abuse, and history of opioid abuse (step two); and that none of these impairments qualified as conclusively disabling under the agency's Listings (step three). (Tr. at 17-18.)

Prior to step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform light work, except that she was limited to occasional overhead reaching and frequent reaching in all other directions on the right, occasional pushing/pulling with the right arm, and occasional climbing and postural movements. She was further limited to simple, routine, and repetitive tasks, not at a production-rate pace, occasional interaction with supervisors and coworkers, no interaction with the public, and no more than occasional decision making and exposure to changes in the job setting. Finally, she would be off task 10% of the time, in addition to normal breaks. (Tr. at 19.)

In making this finding, the ALJ considered plaintiff's statements regarding the nature and severity of her symptoms, as well as the medical opinion evidence. Plaintiff alleged significant limitations in her ability to sit, stand, walk, lift, concentrate, and get along with others, but the ALJ found her statements regarding the severity of her limitations inconsistent with the evidence of record. (Tr. at 20.)

The ALJ first considered the consistency of plaintiff's allegations with the medical evidence. Regarding plaintiff's neck and back impairments, imaging had not revealed significant problems (Tr. at 21, citing Tr. at 1120, 792, 1033), and physical exams throughout the relevant period, including during the consultative examinations performed by Drs. Linford and Hafeez, revealed normal or largely normal findings (Tr. at 21, citing 1118, 768-70, 789-91, 932). In terms of her mental impairments, while plaintiff had been diagnosed with and treated for various conditions (Tr. at 21), multiple mental status exams throughout the relevant period

7

revealed normal or largely normal findings (Tr. at 22, citing Tr. at 1214, 957, 1344), and the July 2014 psychological consultative exam did not reveal more than moderate difficulties (Tr. at 22, citing Tr. at 795-800). The medical record also contained notes confirming that plaintiff received significant benefit from treatment. (Tr. at 22-23, citing Tr. at 1301, 1314, 848, 839, 834-36, 831, 829, 826, 824.)

The ALJ further noted that plaintiff reported engaging in a variety of daily activities, including preparing simple meals, doing light housekeeping chores, and regularly babysitting her grandsons, suggesting a greater level of functioning than she alleged. (Tr. at 18, 23.) Finally, the record contained evidence of inconsistencies; for instance, plaintiff testified that she had not had any alcohol in the last two years, yet the record documented a positive test for alcohol during that period.[4] (Tr. at 23, citing Tr. at 871.)

As for the opinion evidence, the ALJ gave great weight to the opinion of agency medical consultant Dr. Bente, who opined that plaintiff could perform a range of light work. The ALJ noted that Dr. Bente had knowledge of social security disability programs and found his opinion consistent with the overall record. (Tr. at 23.) For similar reasons, the ALJ gave great weight to the report of agency psychological consultant Dr. Biscardi, who found that plaintiff could handle simple, routine tasks.[5] (Tr. at 24.)

The ALJ gave some weight to the opinion of consultative medical examiner Dr. Linford. The ALJ accepted Dr. Linford's conclusion that plaintiff could not handle heavy loads but

---

[4]For similar reasons, the ALJ discounted plaintiff's third-party evidence (Tr. at 492-99, 517), which alleged similar limitations (Tr. at 25).

[5]The ALJ gave little weight to the opinions of Drs. Mamaril and Walls, who found the evidence at the initial level insufficient to assess plaintiff's condition. The ALJ found the evidence available at the hearing level sufficient to assess plaintiff's condition. (Tr. at 23.)

8

rejected his opinion regarding overhead activity as the doctor's physical exam revealed that plaintiff could reach over head. (Tr. at 24.) The ALJ also gave some weight to the opinion of Dr. Dolezal, whose examination suggested no more than moderate limitations in mental functioning. (Tr. at 24.)

Finally, the ALJ gave little weight to the opinions of treating physician Dr. Baylon, as Dr. Baylon did not provide an explanation for his opinions, cite relevant evidence to the support them, or provide a function-by-function assessment of plaintiff's physical abilities. (Tr. at 25, citing Tr. at 1096-97.)[6] Nor were the opinions consistent with the record as a whole. For example, Dr. Baylon opined that plaintiff could not lift at all; however, imaging had not revealed significant problems in the cervical or lumbar spine, and physical exams revealed normal or largely normal findings regarding plaintiff's neck and back, including normal or close to normal range of motion, normal gait, and negative straight leg raises. (Tr. at 25.)

At step four, the ALJ found that plaintiff had no past relevant work. (Tr. at 25.) At step five, relying on the testimony of the VE, the ALJ found that plaintiff could perform other jobs such as office helper, food preparer, and sorter. He therefore found her not disabled. (Tr. at 26.)

On December 18, 2017, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's application. See Barrett v. Berryhill, 904 F.3d 1029, 1031 (7th Cir. 2018). This action followed.

---

[6]These opinions are set forth on work/school excuse slips dated April 5, 2013 (Tr. at 1096) and April 1, 2013 (Tr. at 1097). The April 5 note asks that plaintiff be excused "from work/school from 4/5/13 to _____." (Tr. at 1096.) The comments are largely illegible but appear to state no lifting. (Tr. at 1096.) The April 1 note asks that plaintiff be excused from work/school from 3/23/13-4/2/13. The comment states: "Kimberly may return to work/school 4/2/13." (Tr. at 1097.)

9

## II. STANDARD OF REVIEW

The court will reverse an ALJ's decision "only if it is not supported by substantial evidence or if it is the result of an error of law." Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. Substantial evidence review is deferential; the court will not re-weigh the evidence or substitute its judgment for that of the ALJ. Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Even if reasonable minds could differ concerning whether the claimant is disabled, the court must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported. Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015). Finally, while the ALJ must build a logical bridge from the evidence to his conclusion, he need not provide a complete written evaluation of every piece of testimony and evidence. Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005).

## III. DISCUSSION

The ALJ applied the correct legal standards for determining disability in this case, and he supported his findings with substantial evidence in the record. Plaintiff identifies no specific errors in his decision. Plaintiff proceeds pro se in this court, which obligates me to construe her papers liberally. Nevertheless, even pro se litigants must develop their arguments. E.g., Cadenhead v. Astrue, 410 Fed. Appx. 982, 984 (7th Cir. 2011) (citing Anderson v. Hardman, 241 F.3d 544, 545 (7th Cir. 2001)). I discuss in turn the points raised in plaintiff's brief.

On page one of her brief, plaintiff indicates that she was seriously injured in the 1997 car accident, that doctors have told her she will be in pain for the rest of her life, and that she has received a variety of treatments. The ALJ thoroughly considered the medical evidence in

10

this case, including plaintiff's 1997 surgery and the treatment she received thereafter. (Tr. at 20-21.) He also considered plaintiff's alleged symptoms under the two-step test set forth in the regulations and based on the applicable regulatory factors (Tr. at 20, 23), e.g., consistency with the objective medical evidence, effectiveness of treatment, and daily activities. See 20 C.F.R. § 404.1529. He further considered the medical opinions, assigning weight based on the pertinent regulatory factors (Tr. at 20, 23-25), e.g., supportability, consistency, and expertise. See 20 C.F.R. § 404.1527(c). The ALJ then reasonably concluded that plaintiff could, despite her severe impairments and residual pain, perform a reduced range of light work. See Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) (explaining that an ALJ need not accept a claimant's claims regarding the severity of his symptoms insofar as they clash with other, objective medical evidence in the record); see also Summers, 864 F.3d at 528 ("We give the ALJ's credibility finding 'special deference' and will overturn it only if it is 'patently wrong.'"). Plaintiff contends that she should be entitled to disability benefits, but judicial review "focuses not on whether [the claimant] was disabled during the relevant period, but instead on whether the ALJ's findings were supported by substantial evidence." Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

At the top of page two of her brief, plaintiff notes that the record contains doctor reports related to previous denials. However, the ALJ primarily relied on the reports created by Drs. Bente and Biscardi for this application. (Tr. at 25.) The ALJ discussed a 2010 psychological consultative examination but gave it only it limited weight because it was created well before the alleged onset date and there was no indication that it reflected plaintiff's current functioning. (Tr. at 25.) Plaintiff also appears to take issue with reports from doctors who did not see her. While the applicable regulation provides that more weight is generally given to the opinion of

an examining source, see 20 C.F.R. § 404.1527(c)(1), it is appropriate for the ALJ to rely on the opinions of consulting "physicians and psychologists who are also experts in social security disability evaluation." Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004). Plaintiff further claims that she is going blind, and that during the last exam the agency sent her to the doctor did not do an eye exam. However, it was plaintiff's burden, not the agency's, to prove that she was disabled, see Summers, 864 F.3d at 527, and plaintiff cites no record evidence supporting a vision impairment. As indicated above, the agency did send plaintiff to Dr. Hafeez on June 24, 2014, to evaluate her eye issues. (Tr. at 789.) Dr. Hafeez conduct a Snellen chart examination, which revealed 20/20 vision on each side without glasses. (Tr. at 790.) Plaintiff indicates that the doctors the agency sent her to did not contact the providers who know her current mental and physical state, but the ALJ, not any doctor, makes the final decision about whether a claimant is disabled, Rudicel v. Astrue, 282 Fed. Appx. 448, 453 (7th Cir. 2008), and plaintiff makes no claim that the ALJ failed to develop the record or consider the treatment notes from her providers.

In the middle of page two, plaintiff cites a number of record exhibits and appears to argue that they contain incorrect, irrelevant, or redundant information. However, she fails to explain how the presence of these documents in the record caused error in the ALJ's decision. At the hearing, plaintiff's counsel offered no objection to the admission of the exhibits in the record. (Tr. at 90.) If any of those records contained irrelevant or misleading information, the time for correction was at the hearing. See Summers, 864 F.3d at 527 ("[B]ecause Summers was represented by counsel at the hearing, she is presumed to have made her best case before the ALJ.").

On page two carrying over to page three, plaintiff indicates that she wants to be

12

protected by the ADA. However, this case arises under social security law, which contains a different definition of "disability" than the Americans with Disabilities Act. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 801 (1999); Lee v. City of Salem, 259 F.3d 667, 672-73 (7th Cir. 2001).

Finally, on page three of her brief, plaintiff indicates the agency has not entered proper information regarding the case, but she does not explain how. She further indicates she has some documents to support her case that are apparently not in the record. However, the correctness of an ALJ's "decision depends on the evidence that was before him." Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993). "He cannot be faulted for having failed to weigh evidence never presented to him[.]" Id. As indicated above, plaintiff makes no claim that the ALJ failed to develop the record, and at the hearing plaintiff's counsel indicated that the record was complete. (Tr. at 90.) "The degree of the ALJ's responsibility to take the initiative [to further develop the record] is influenced, if not entirely dictated, by the presence or absence of counsel for the claimant." Nicholson v. Astrue, 341 Fed. Appx. 248, 254 (7th Cir. 2009). Even when the claimant proceeds pro se before the agency, the Seventh Circuit has held that a significant omission is usually required before the court will find that the ALJ failed to develop the record fully and fairly. E.g., Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994). Plaintiff does not specify what is missing from the record here. Nor does she argue for a remand under 42 U.S.C. § 405(g), sentence six, for consideration of new, material evidence. See Eads, 983 F.2d at 817 (discussing sentence six remands). There is accordingly no basis for remand for revision of the record or collection of additional evidence. See Wilson v. Berryhill, 737 Fed. Appx. 286, 290 (7th Cir. 2018) (finding record adequately developed where the agency ordered three consultative exams, x-rays, and two reviewing opinions).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 31st day of January, 2019.

/s Lynn Adelman
LYNN ADELMAN
District Judge